IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| TREEHOUSE AVATAR LLC, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 15-427-SLR |
| | ) | |
| VALVE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

Brian E. Farnan, Esquire and Michael J. Farnan, Esquire of Farnan LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Padmaja Chinta, Esquire, Andrew Berks, Esquire, Henry Cittone, Esquire, and Peter Fratangelo, Esquire of Cittone & Chinta LLP.

Richard L. Horwitz, Esquire, David E. Moore, Esquire, Bindu A. Palapura, Esquire, and Stephanie E. O'Byrne, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Jayson W. Sowers, Esquire, Gavin Skok, Esquire, and Shata L. Stucky, Esquire of Riddell Williams P.S. and Reynaldo C. Barceló, Esquire of Barceló, Harrison & Walker, LLP.

**MEMORANDUM OPINION**

Dated: March _30_ , 2016
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

On May 27, 2015, plaintiff Treehouse Avatar LLC ("plaintiff") filed a complaint

alleging infringement of U.S. Patent No. 8,180,858 ("the '858 patent") against defendant

Valve Corporation ("defendant").  (D.I. 1)  Presently before the court are defendant's

motions to dismiss (D.I. 11) and transfer (D.I. 17).  The court has jurisdiction pursuant to

28 U.S.C. §§ 1331 and 1338(a).

## II. BACKGROUND

Plaintiff is a limited liability company organized under the laws of the State of

Delaware, having its principal place of business in Ottawa, Ontario, Canada.  (D.I. 1 at ¶

2)  Defendant is incorporated in the State of Washington, with a principal place of

business in Bellevue, Washington.  (D.I. 1 at ¶ 3)  The '858 patent, titled "Method and

System for Presenting Data Over A Network Based On Network User Choices and

Collecting Real-Time Data Related To Said Choices," was filed on November 30, 2010

and issued on May 15, 2012.

## III. MOTION TO TRANSFER

### A. Standard

Section 1404(a) of Title 28 of the United States Code grants district courts the

authority to transfer venue "[f]or the convenience of parties and witnesses, in the

interests of justice . . . to any other district or division where it might have been brought."

28 U.S.C. § 1404(a).  Much has been written about the legal standard for motions to

transfer under 28 U.S.C. § 1404(a).  *See, e.g., In re Link_A_Media Devices Corp.*, 662

F.3d 1221 (Fed. Cir. 2011); *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995); *Helicos Biosciences Corp. v. Illumina, Inc.*, 858 F. Supp. 2d 367 (D. Del. 2012).

Referring specifically to the analytical framework described in *Helicos*, the court starts with the premise that "a plaintiff, as the injured party, generally ha[s] been 'accorded [the] privilege of bringing an action where he chooses.'" 858 F. Supp. 2d at 371 (quoting *Norwood v. Kirkpatrick*, 349 U.S. 29, 31 (1955)). Indeed, the Third Circuit in *Jumara* reminds the reader that "[t]he burden of establishing the need for transfer . . . rests with the movant" and that, "in ruling on defendants' motion, the plaintiff's choice of venue should not be lightly disturbed." 55 F.3d at 879 (citation omitted).

The Third Circuit goes on to recognize that,

[i]n ruling on § 1404(a) motions, courts have not limited their consideration to the three enumerated factors in § 1404(a) (convenience of parties, convenience of witnesses, or interests of justice), and, indeed, commentators have called on the courts to "consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum."

*Id.* (citation omitted). The Court then describes some of the "many variants of the private and public interests protected by the language of § 1404(a)." *Id.*

The private interests have included: plaintiff's forum of preference as manifested in the original choice; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties as indicated by their relative physical and financial condition; the convenience of the witnesses - **but only to the extent that the witnesses may actually be unavailable for trial in one of the fora**; and the location of books and records **(similarly limited to the extent that the files could not be produced in the alternative forum)**.

The public interests have included: the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at

home; the public policies of the fora; and the familiarity of the trial judge
with the applicable state law in diversity cases.

*Id.* (citations omitted) (emphasis added).

## B. Analysis

With the above "jurisdictional guideposts" in mind, the court turns to the "difficult
issue of federal comity" that transfer motions present. *E.E.O.C. v. Univ. of Pa.*, 850
F.2d 969, 976 (3d Cir. 1988). Plaintiff does not challenge that venue would also be
proper in the Western District of Washington. As such, the court does not address this
further. *See* 28 U.S.C. § 1404(a); (D.I. 16)

Both Delaware and Washington are legitimate forums in which to pursue the
litigation at bar. Defendant does not dispute that Delaware is a valid venue, indeed,
defendant sells its products across the United States (including to customers in
Delaware). (D.I. 18 at 4) Defendant's state of incorporation also is a traditional and
legitimate venue, as is the locus of its business activities. Defendant contends that
plaintiffs' choice of forum should be given little or no deference as Delaware is not
"home turf" for the plaintiff. Since plaintiff incorporated in Delaware weeks before filing
the action at bar, defendant argues that plaintiff's home turf should be deemed Ottawa,
Canada, where it has its principal place of business. Business entities choose their
situs of incorporation for varied reasons, including the ability to sue and be sued in that
venue.[1] *See, Cradle IP, LLC v. Texas Instruments, Inc.*, 923 F. Supp. 2d 696, 699 (D.
Del. 2013). Defendant concludes that it is more convenient and efficient to litigate in

---

[1] It is of no consequence that plaintiff appears to be a non-practicing entity; such a
business strategy is not nefarious. The court declines to treat such non-practicing
entities as anything less than holders of constitutionally protected property rights, those
rights having been legitimized by the Patent & Trademark Office.

Washington, based on its incorporation and business offices in Washington. Given that "convenience" is separately considered in the transfer analysis, the court declines to elevate defendant's choice of venue over the choice of plaintiff. Notwithstanding the Federal Circuit's recent discussion of "connections to a preferred forum made in anticipation of litigation and for the likely purpose of making that forum appear convenient," *In re Microsoft*, 630 F.3d 1361, 1364 (Fed. Cir. 2011),[2] that plaintiffs have historically been accorded the privilege of choosing their preferred venue for pursuing their claims remains a factor in the application of the law of this circuit.

A claim for patent infringement arises wherever someone has committed acts of infringement, to wit, "makes, uses, offers to sell, or sells any patented invention" without authority. *See generally* 35 U.S.C. § 271(a); *Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998) (an infringement claim "arises out of instances of making, using, or selling the patented invention"). Defendant does not deny that it sells its games in other districts, including Delaware, therefore, the asserted patent claims may be said to arise in Delaware. Instead, defendant points out that the games accused of infringement "were all designed, developed, and produced by [defendant] in the Western District of Washington." (D.I. 18 at 12) According to defendant, the fact that its sales and marketing activity emanated from Washington tips the scales in favor of transfer. (*Id.*)

The Third Circuit in *Jumara* indicated that, in evaluating the convenience of the parties, a district court should focus on the parties' relative physical and financial

---

[2] The Court, applying Fifth Circuit law, noted the "added wrinkle" that the plaintiff had incorporated under the laws of Texas sixteen days before filing suit, but stated "that effort is no more meaningful, and no less in anticipation of litigation."

4

condition. Here, defendant employs about 250 people (D.I. 23 at 6) and its estimated 2014 revenue was $1.5 billion (D.I. 22 at 12).[3] Neither party advances information as to plaintiff's financial condition, although plaintiff states that defendant "has shown it is better suited to litigate this case in Delaware." (D.I. 22 at 12, citing cases where defendants' operations were larger than plaintiff's as a non-operating company)

With respect to the convenience of the witnesses, it is not whether witnesses are inconvenienced by litigation but, rather, whether witnesses "actually may be unavailable for trial in one of the fora" that is the relevant consideration in this analysis. *Jumara*, 55 F.3d at 879. Defendant argues that its employees would be inconvenienced by travel to Delaware; the named inventors are "apparently located in California and Hawaii, clearly much closer to the Western District of Washington;" and the patent prosecution attorneys are also not located in Delaware. (D.I. 18 at 13-15) Moreover, defendant points out that there are no known third party witnesses in Delaware. (*Id.* at 15) Defendant has not indicated that any particular witness who may be called upon to testify at trial would be unwilling to do so.[4]

The Third Circuit in *Jumara* advised that the location of books and records is only determinative if "the files c[an] not be produced in the alternative forum." *Jumara*, 55

---

[3] Of note, a search for "Valve Corporation" in the PACER Case Locator reveals 57 civil results, showing that defendant has litigated in 7 states (including Delaware) as both plaintiff and defendant.
[4] With respect to trials, in the nine patent jury trials this judicial officer conducted between March 2010 and October 2011, an average of three fact witnesses per party appeared live for trial, with the average length of trial being 28 hours (with the parties often using less time than allocated, on average, 25 hours). Further, depositions in the cases over which this judicial officer presides are generally taken where the deponents reside or work. There is no suggestion that this case will be an exception.

F.3d at 879.  Defendant argues that all of the documentary and tangible evidence is located in the Western District of Washington and that no documents are located in Delaware.  (D.I. 18 at 16)  Consistent with the realities of modern technology, this court's view is that virtually all businesses maintain their books and records in electronic format readily available for review and use at any location.  This conclusion is reflected in the facts of the litigation at bar.  According to defendant's arguments, document transfer is likely to occur between:  plaintiff physically located in Ottowa, Canada, plaintiff's attorneys located in Delaware and New York, defendant located in Washington, and defendant's attorneys located in Washington, California and Delaware. With respect to trial, defendant fails to show how these documents or tangible evidence are incapable of being presented at trial in Delaware.

The court recognizes that trial in Washington may be easier and less expensive for defendant, where its operations are located.  For plaintiff, trial in Washington is more burdensome as the travel distance from Ottowa, Canada to Seattle, Washington is some 5.5 times further than to Wilmington, Delaware.[5]  In the case at bar, defendant filed the instant motion to transfer after it filed (and the parties fully briefed) a motion to dismiss for failure to state a claim.  In any event, because very few cases are resolved through trial,[6] and because trials in most busy districts are of limited duration, this factor

---

[5] According to Google Maps, the driving distance from Ottowa, Canada to Wilmington, Delaware is 465 miles and to Seattle, Washington, 2575 miles.

[6] According to national statistics, less than 13.9 % of patent infringement cases resolve on the merits.  Howard, Brian, *The Truth About Patent Damage Awards*, Law360 (Oct. 16, 2014) (patent cases filed between 2000 and 2013); Morgan, Paul, *Microsoft v. i4i - Is the Sky Really Falling?*, PatentlyO (Jan. 9, 2011) ("[M]ore than 97% of patent suits are settled before trial with no judicial validity test."); Denlow, Morton, Hon. Ret., *Magistrate Judges' Important Role in Settling Cases*, The Federal Lawyer, 101 (May/June 2014) ("In 2012, less than 2 percent of federal civil cases went to trial.").

should not be accorded significant weight. It certainly should not become the tail that wags the dog.

Local interest in deciding local controversies is not a dispositive factor, as patent litigation does not constitute a local controversy in most cases. Defendant points out that any adverse ruling would affect Washington business, Washington workers, and the Washington economy far more than Delaware. However, patent litigation implicates constitutionally protected property rights, is governed by federal law reviewed by a court of appeals of national (as opposed to regional) stature, and affects national (if not global) markets. *See Cradle IP v. Texas Instruments, Inc.*, 923 F.Supp.2d 696, 700-01 (D. Del. 2013).

As to the remaining *Jumara* public interest factors,[7] defendant argues that each of these favors Washington. Defendant points out that plaintiff would have to register its judgment in the Western District of Washington to execute on it; practical considerations favor Washington as plaintiff has no other cases in Delaware and litigating the case in Washington would be easier and less expensive;[8] and litigation times are shorter in the Western District of Washington. (D.I. 18 at 17-19) Plaintiff responds that each of these factors is neutral: As defendant concedes, a judgment is entitled to full faith and credit throughout the country; practical considerations make it easier for plaintiff to travel to Wilmington, Delaware, than to Seattle, Washington; the difference in litigation time is

---

[7] The public policies of the fora and the familiarity of the judge with state law carry little weight in this transfer analysis, as they are mostly neutral or largely irrelevant to patent cases.

[8] Essentially repeating arguments from the factors considered above.

not significant and as pointed out above, potentially irrelevant if the case settles before trial.

Defendant has the burden of persuading the court that transfer is appropriate, not only for its convenience but in the interests of justice. In the case-at-bar, plaintiff chose to incorporate and then file suit in Delaware, a legitimate forum, where defendant's claims may be said to arise. As is usual in these cases, the convenience factors do not weigh in favor of transfer because discovery is a local event and trial is a limited event.[9] Although Delaware is not the locus of any party's business activities, it is a neutral forum. The court is not persuaded that transfer is warranted in the interests of justice. Defendant's motion to transfer venue (D.I. 17) is denied.

## IV. MOTION TO DISMISS

### A. Standard of Review

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son,*

---

[9] Discovery is largely electronic, with depositions taking place where the deponents reside or work. Moreover, most trials now are scheduled for less than seven days, and involve only a handful of live witnesses and a limited number of documents.

8

*Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11.  Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).  As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011).  This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).  The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## B. 35 U.S.C. § 101

Section 101 provides that patentable subject matter extends to four broad

categories, including: "new and useful process[es], machine[s], manufacture, or

composition[s] of matter." 35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593,

601 (2010) ("*Bilski II*"); *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). A "process"

is statutorily defined as a "process, art or method, and includes a new use of a known

process, machine manufacture, composition of matter, or material." 35 U.S.C. § 100(b).

The Supreme Court has explained:

> A process is a mode of treatment of certain materials to produce a given
> result. It is an act, or a series of acts, performed upon the subject-matter
> to be transformed and reduced to a different state or thing. If new and
> useful, it is just as patentable as is a piece of machinery. In the language
> of the patent law, it is an art. The machinery pointed out as suitable to
> perform the process may or may not be new or patentable; whilst the
> process itself may be altogether new, and produce an entirely new result.
> The process requires that certain things should be done with certain
> substances, and in a certain order; but the tools to be used in doing this
> may be of secondary consequence.

*Diamond v. Diehr*, 450 U.S. 175, 182-83 (1981) (internal quotations omitted).

The Supreme Court recognizes three "fundamental principle" exceptions to the

Patent Act's subject matter eligibility requirements: "laws of nature, physical

phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601. In this regard, the Court

has held that "[t]he concepts covered by these exceptions are 'part of the storehouse of

knowledge of all men ... free to all men and reserved exclusively to none.'" *Bilski II*, 561

U.S. at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130

(1948)). "[T]he concern that drives this exclusionary principle is one of pre-emption,"

that is, "'that patent law not inhibit further discovery by improperly tying up the future use

of' these building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, —

10

U.S. —, 134 S.Ct. 2347, 2354 (2014) (citing *Bilski II*, 561 U.S. at 611-12 and *Mayo*

*Collaborative Servs.v. Prometheus Labs., Inc.*, 566 U.S. —, 132 S.Ct. 1289, 1301

(2012)).

Although a fundamental principle cannot be patented, the Supreme Court has

held that "an application of a law of nature or mathematical formula to a known structure

or process may well be deserving of patent protection," so long as that application

would not preempt substantially all uses of the fundamental principle. *Bilski II*, 561 U.S.

at 611 (quoting *Diehr*, 450 U.S. at 187) (internal quotations omitted); *In re Bilski*, 545

F.3d 943, 954 (Fed. Cir. 2008) ("*Bilski I*"). The Court has described the

> framework for distinguishing patents that claim laws of nature, natural
> phenomena, and abstract ideas from those that claim patent-eligible
> applications of those concepts. First, we determine whether the claims at
> issue are directed to one of those patent-ineligible concepts. If so, we
> then ask, "[w]hat else is there in the claims before us?" To answer that
> question, we consider the elements of each claim both individually and "as
> an ordered combination" to determine whether the additional elements
> "transform the nature of the claim" into a patent-eligible application. We
> have described step two of this analysis as a search for an "'inventive
> concept'"—i.e., an element or combination of elements that is "sufficient to
> ensure that the patent in practice amounts to significantly more than a
> patent upon the [ineligible concept] itself."

*Alice*, 134 S.Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1294, 1296-98).[10]

"[T]o transform an unpatentable law of nature into a patent-eligible application of

such a law, one must do more than simply state the law of nature while adding the

---

[10] The machine-or-transformation test still may provide a "useful clue" in the second
step of the *Alice* framework. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed.
Cir. 2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life
Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012)). A claimed process can
be patent-eligible under § 101 if: "(1) it is tied to a particular machine or apparatus, or
(2) it transforms a particular article into a different state or thing." *Bilski I*, 545 F.3d at
954, *aff'd on other grounds, Bilski II*, 561 U.S. 593.

words 'apply it.'" *Mayo*, 132 S.Ct. at 1294 (citing *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972)) (emphasis omitted). It is insufficient to add steps which "consist of well-understood, routine, conventional activity," if such steps, "when viewed as a whole, add nothing significant beyond the sum of their parts taken separately." *Mayo*, 132 S. Ct. at 1298. "Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law." *Id.* (citations omitted). Also, the "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant post-solution activity.'" *Bilski II*, 561 U.S. at 610-11 (citation omitted). For instance, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (citations omitted).

Because computer software comprises a set of instructions,[11] the first step of *Alice* is, for the most part, a given; i.e., computer-implemented patents generally involve abstract ideas. The more difficult part of the analysis is subsumed in the second step of the *Alice* analysis, that is, determining whether the claims "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," or whether the claims are directed to "a

---

[11] Or, to put it another way, software generally comprises a method "of organizing human activity." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-68 (Fed. Cir. 2015) (citing *Alice*, 134 S.Ct. 2351-52, and *Bilski II*, 561 U.S. at 599).

problem specifically arising in the realm of computer technology" and the claimed

solution specifies how computer technology should be manipulated to overcome the

problem. *DDR Holdings, LLC v. Hotels.Com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir.

2014).

    In *DDR*, for example, the claims at issue involved computer technology directed

at retaining website visitors.[12]   In its analysis, the Federal Circuit rejected the notion that

the pre-Internet analog to the claims at issue ended the inquiry, explaining that while

_____

[12] In *DDR*, representative claim 19 of U.S. Patent No. 7,818,399 recites:

> A system useful in an outsource provider serving web pages offering
> commercial opportunities, the system comprising:
>  (a) a computer store containing data, for each of a plurality of first web
> pages, defining a plurality of visually perceptible elements, which visually
> perceptible elements correspond to the plurality of first web pages;
>   (i) wherein each of the first web pages belongs to one of a plurality of
> web page owners;
>   (ii) wherein each of the first web pages displays at least one active link
> associated with a commerce object associated with a buying opportunity
> of a selected one of a plurality of merchants; and
>   (iii) wherein the selected merchant, the out-source provider, and the
> owner of the first web page displaying the associated link are each third
> parties with respect to one other;
>  (b) a computer server at the outsource provider, which **computer server**
> is coupled to the computer store and **programmed to**:
>   (i) receive from the web browser of a computer user a signal indicating
> activation of one of the links displayed by one of the first web pages;
>   (ii) automatically identify as the source page the one of the first web
> pages on which the link has been activated;
>   (iii) in response to identification of the source page, automatically
> retrieve the stored data corresponding to the source page; and
>   (iv) using the data retrieved, automatically generate and transmit to the
> web browser a second web page that displays:
>    (A) information associated with the commerce object associated with
> the link that has been activated, and
>    (B) the plurality of visually perceptible elements visually
> corresponding to the source page.

773 F.3d at 1249-50 (emphasis added).

the "store within a store" concept . . . may have been well-known by the
relevant time frame, that practice did not have to account for the
ephemeral nature of an Internet "location" or the near-instantaneous
transport between these locations made possible by standard Internet
communication protocols, which introduces a problem that does not arise
in the "brick and mortar" context.

773 F.3d at 1258. In other words, "[a]lthough the claims address[ed] a business

challenge . . ., it [was] a challenge particular to the Internet." *Id.* at 1257. The Court

concluded that, under any of the characterizations of the abstract idea, the claims

satisfied step two of *Alice* as being

different enough in substance from those in *Ultramercial* because they do
not broadly and generically claim "use of the Internet" to perform an
abstract business practice (with insignificant added activity). Unlike the
claims in *Ultramercial*, the claims at issue here specify how interactions
with the Internet are manipulated to yield a desired result – a result that
overrides the routine and conventional sequence of events ordinarily
triggered by the click of a hyperlink. . . .

In sum, the 399 patent's claims are unlike the claims in *Alice, Ultramercial,
buySAFE, Accenture*, and *Bancorp* that were found to be "directed to" little
more than an abstract concept. To be sure, the '399 patent's claims do
not recite an invention as technologically complex as an improved,
particularized method of digital data compression. But nor do they recite a
commonplace business method aimed at processing business
information, applying a known business process to the particular
technological environment of the Internet, or creating or altering
contractual relations using generic computer functions and conventional
network operation, such as the claims in *Alice, Ultramercial, buySAFE,
Accenture*, and *Bancorp*.

*Id.* at 1258-59 (citing *Alice*, 134 S.Ct. at 2359; *Ultramercial*, 772 F.3d 709, 714-16 (Fed.

Cir. 2014); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014);

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344-45

(Fed. Cir. 2013); *Bancorp*, 687 F.3d at 1277-78); *but see Dealertrack, Inc. v. Huber*, 674

F.3d 1315, 1331-35 (Fed. Cir. 2012).

In *DDR*, the analytical framework (in the context of computer-implemented inventions) was articulated so as to require that the inventive concept "recite a specific way" to solve a "particular Internet-centric problem," with the claimed solution being "necessarily rooted in computer technology," so that the result "is not merely the routine or conventional use of the Internet." 773 F.3d at 1257, 1259. Since providing that explanation, the Federal Circuit has not preserved the validity of any other computer-implemented invention under § 101.[13] For instance, in *Intellectual Ventures*, a case that also presented claims directed at websites,[14] the Court explained that, "[a]t step one of the *Alice* framework, it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a "'fundamental . . . practice long prevalent in our system.'" *Intellectual Ventures*, 792 F.3d at 1369 (citing *Alice*, 134 S. Ct. at 2356). The Court characterized the claims at issue as relating to "customizing

---

[13] *See, e.g., In re Smith,* Civ. No. 2015-1664, 2016 WL 909410 (Fed. Cir. Mar. 10, 2016); *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314 (Fed. Cir. 2016); *Vehicle Intelligence and Safety LLC v. Mercedes-Benz USA, LLC*, Civ. No. 2015-1411, 2015 WL 9461707 (Fed. Cir. Dec. 28, 2015); *Versata Dev. Grp., Inc. v. SAP America, Inc.*, 793 F.3d 1306 (Fed. Cir. 2015); *Intellectual Ventures*, 792 F.3d 1363; *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir. 2015); *Allvoice Devs. US, LLC v. Microsoft Corp.*, 612 Fed. Appx. 1009 (Fed. Cir. 2015); *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014).
[14] Representative claim 1 of U.S. Patent No. 7,603,382 recites:

> A system for providing web pages accessed from a web site in a manner which presents the web pages tailored to an individual user, comprising:
>  an interactive interface configured to provide dynamic web site navigation data to the user, the interactive interface comprising:
>  a display depicting portions of the web site visited by the user as a function of the web site navigation data; and
>  a display depicting portions of the web site visited by the user as a function of the user's personal characteristics.

*Intellectual Ventures*, 792 F.3d at 1368.

information based on (1) information known about the user and (2) navigation data." *Id.*

Likening "[t]his sort of information tailoring" to "providing different newspaper inserts

based upon the location of the individual," *id.*, the Court concluded that the first aspect

of the inventive concept was an abstract idea. The second aspect of the inventive

concept, using "navigation data (i.e., information relating to when the user navigated to

the website) to 'customize' the website," *id.*, the Court again concluded that "[t]ailoring

information based[, e.g.,] on the time of day of viewing is also an abstract, overly broad

concept long-practiced in our society." *Id.* at 1370.[15]

Turning to the second step of *Alice*, the *Intellectual Ventures* Court concluded

that the claims at issue presented no inventive concept "that would support patent

eligibility."[16]  *Id.* at 1370.  The Federal Circuit explained:

> Steps that do nothing more than spell out what it means to "apply it on a
> computer" cannot confer patentability. . . .  Requiring the use of a
> "software" "brain" "tasked with tailoring information and providing it to the
> user" provides no additional limitation beyond applying an abstract idea,
> restricted to the Internet, on a generic computer.

---

[15] In this regard, the observation made by the district court in *Paone v. Broadcom Corp.*,
Civ. No. 15-0596, 2015 WL 4988279 (E.D.N.Y. Aug. 19, 2015), is worth noting, that (in
the context of encryption technology) it was of

> no moment that "[e]ncryption, in general, represents a basic building block
> of human ingenuity that has been used for hundreds, if not thousands, of
> years."  That is because [U.S. Patent No. 6,259,789] does not claim a
> process that can or does involve the encryption of data for some purpose
> that is otherwise abstract.  Rather, it claims a specific method of doing so.

*Id.* at \*7 (citation omitted) (emphasis omitted).
[16] Despite the "dynamic presentation of data – that is, . . . the claimed invention in 'real
time' customizes the web page based on the information it knows about the particular
viewer" – and despite the claimed "interactive interface," which was "broadly construed
by the district court to mean 'a selectively tailored medium by which a web site user
communicates with a web site information provider.'" *Intellectual Ventures*, 792 F.3d at
1369-70.

*Id.* at 1370-71. In distinguishing *DDR*, the *Intellectual Ventures* Court offered the

following analysis:

> The patent at issue in [*DDR*] dealt with a problem unique to the Internet:
> Internet users visiting one web site might be interested in viewing products
> sold on a different web site, but the owners of the first web site did not
> want to constantly redirect users away from their web site to a different
> web site. . . . The claimed solution used a series of steps that created a
> hybrid web page incorporating "look and feel" elements from the host web
> site with commerce objects from the third-party web site. . . . The patent
> at issue in *DDR* provided an Internet-based solution to solve a problem
> unique to the Internet that (1) did not foreclose other ways of solving the
> problem, and (2) recited a specific series of steps that resulted in a
> departure from the routine and conventional sequences of events after the
> click of a hyperlink advertisement. . . . The patent claims [in *Intellectual
> Ventures*] do not address problems unique to the Internet, so *DDR* has no
> applicability.[17]

*Id.* at 1371 (citations omitted).

In reviewing post-*Alice* cases such as *DDR* and *Intellectual Ventures*, the court is

struck by the evolution of the § 101 jurisprudence, from the complete rejection of

patentability for computer programs[18] to the almost complete acceptance of such,[19] to

the current (apparent) requirements that the patent claims in suit (1) disclose a problem

"necessarily rooted in computer technology," and (2) claim a solution that (a) not only

departs from the "routine and conventional" use of the technology, but (b) is sufficiently

specific so as to negate the risk of pre-emption. *See DDR*, 773 F.3d at 1257;

*Intellectual Ventures*, 792 F.3d at 1371. In other words, even though most of the patent

---

[17] But recall the "store within a store" pre-Internet analog rejected in *DDR*.
[18] *See, e.g.*, 33 Fed. Reg. 15581, 15609-10 (1968), and Justice Steven's dissent in
*Diehr*, whose solution was to declare all computer-based programming unpatentable,
450 U.S. at 219.
[19] *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368 (Fed. Cir.
1998), *abrogated by Bilski I*, in which "a computer-implemented invention was
considered patent-eligible so long as it produced a 'useful, concrete and tangible
result.'" *DDR*, 773 F.3d at 1255 (citing *State Street Bank*, 149 F.3d at 1373).

claims now being challenged under § 101 would have survived such challenges if mounted at the time of issuance, these claims are now in jeopardy under the heightened specificity required by the Federal Circuit post-*Alice*. Moreover, it is less than clear how a § 101 inquiry that is focused through the lens of specificity can be harmonized with the roles given to other aspects of the patent law (such as enablement under § 112 and non-obviousness under § 103),[20] especially in light of the Federal Circuit's past characterization of § 101 eligibility as a "coarse" gauge of the suitability of broad subject matter categories for patent protection. *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010). Given the evolving state of the law, the § 101 analysis should be, and is, a difficult exercise.[21] At their broadest, the various decisions of the Federal Circuit[22] would likely ring the death-knell for patent

---

[20] Indeed, Judge Plager, in his dissent in *Dealertrack*, suggested that,

> as a matter of efficient judicial process I object to and dissent from that part of the opinion regarding the '427 patent and its validity under § 101, the section of the Patent Act that describes what is patentable subject matter. I believe that this court should exercise its inherent power to control the processes of litigation . . ., and insist that litigants, and trial courts, initially address patent invalidity issues in infringement suits in terms of the defenses provided in the statute: "conditions of patentability," specifically §§ 102 and 103, and in addition §§ 112 and 251, and not foray into the jurisprudential morass of § 101 unless absolutely necessary.

*Dealertrack*, 674 F.3d at 1335. *But see CLS Bank Int'l v. Alice Corp. Pty.*, 717 F.3d 1269, 1277 (Fed. Cir. 2013), *aff'd*, 134 S. Ct. 2347 (2014).
[21] And, therefore, not an exercise that lends itself to, e.g., shifting fees pursuant to 35 U.S.C. § 285.
[22] *See, e.g., Dealertrack*, where the claim was about as specific as that examined in *DDR*, yet the Federal Circuit found the patent deficient because it did "not specify how the computer hardware and database [were] **specially programmed** to perform the steps claimed in the patent," 674 F.3d at 1333-34 (emphasis added). The disclosure of such programming details would likely nullify the ability of a patentee to enforce the patent, given the ease with which software can be tweaked and still perform the desired function.

18

protection of computer-implemented inventions,[23] a result not clearly mandated (at least not yet). On the other hand, to recognize and articulate the requisite degree of specificity - either in the equipment used[24] or the steps claimed[25] - that transforms an abstract idea into patent-eligible subject matter is a challenging task. In trying to sort through the various iterations of the § 101 standard, the court looks to *DDR* as a benchmark; i.e., the claims (informed by the specification) must describe a problem and solution rooted in computer technology, and the solution must be (1) specific enough to preclude the risk of pre-emption, and (2) innovative enough to "override the routine and conventional" use of the computer. *DDR*, 773 F.3d at 1258-59. The pre-emption concern is generally amenable to review in the context of a motion to dismiss or for judgment on the pleadings. The second requirement, which may well involve issues of fact relating to the state of the art in the technological environment involved, is more appropriately addressed after discovery in the context of a motion for summary judgment.

## C. Claim Construction

The Federal Circuit has "never set forth a bright line rule requiring district courts to construe claims before determining subject matter eligibility." *Ultramercial, LLC v.*

---

[23] Ironically so, given the national concerns about piracy of American intellectual property.

[24] *See, e.g., SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010), a case where the Federal Circuit found that a GPS receiver was "integral" to the claims at issue. The Court emphasized that a machine will only "impose a meaningful limit on the scope of a claim [when it plays] a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations." *Id.* at 1333.

[25] *See, e.g., DDR*, 773 F.3d at 1257-58; *TQP Dev., LLC v. Intuit Inc.*, Civ. No. 12-180, 2014 WL 651935 (E.D. Tex. Feb. 19, 2014); *Paone*, 2015 WL 4988279.

*Hulu, LLC*, 657 F.3d 1323, 1325 (Fed. Cir. 2011), vacated sub nom. *WildTangent*, 132 S.Ct. 2431 (2012). "Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101." *Content Extraction*, 776 F.3d at 1349 (citing *Ultramercial*, 772 F.3d at 714-15; *Bancorp*, 687 F.3d at 1273-74). However, it may be "desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis." *Bancorp*, 687 F.3d at 1273-74.

In the case at bar, neither party raises issues of claim construction, but instead analyzes the patent based on broader concepts. (D.I. 16 at 3) As such, the court proceeds with the § 101 analysis.

## D. The '858 Patent

The specification describes the invention as filling the need for "increasing network site loyalty . . . [with] an apparatus and method for presenting to network user[]s audio data and visual image data that is indicative of the individuality of the network user" and for "collecting market research data in real-time." (1:52-56; 2:49-50) The "invention is directed to an apparatus and method that employs selectable and modifiable animation to collect data related to the choices made by the users of an information network." (2:55-58) The specification describes "a method having application within an information network having at least one character-enabled network site [("CE site")]. The method provides for the presentation of data to a network user based on choices made by the user while the user is within a character-enabled network site." (3:51-56) The invention also "relates to an apparatus for presenting data to a network user based on choices made by the user while within a character-enabled

20

network site. The apparatus includes a character processor for associating a character

with the user." (4:26-30) For instance, a user may select a "character" (figure 5) and

then select "character attributes," such as clothing (figure 9).

The specification explains:

> The network 14 may include, by way of example, but not necessarily by
> way of limitation, the Internet, Internet II, Intranets, and similar
> evolutionary versions of same.
>     The client side 10 includes a user interface 18 and network browser
> 20 through which a user may communicate with the network-site side 12
> via the network 14. The user interface 18 may include a personal
> computer, network work station or any other similar device having a
> central processing unit (CPU) and monitor with at least one of audio
> presentation, i.e. sound, capability and visual image presentation, e.g.
> video, animation, etc., capability.

(6:34-45) Memory and storage devices store the programs and data necessary to

operate the network sites associated with the server. Other network sites are

configured as CE sites and "operate under the control of site programs housed in the

program memory." (7:3-11) "The site programs are designed to provide to the user

interface 18 audio presentations and visual image presentations tailored to the

"persona" of a character, as defined by a network user." (7:18-21)

As to the market research capabilities, "the site program/data of a CE site may

be designed to provide a means of capturing data related to the identity, tastes,

preferences and opinions of site users." (12:7-10) If a selected character is female or

appears to be of a certain age, these attributes are likely indicative of the user. (12:10-

20) "With respect to tastes, preferences and opinions, the clothing, accessories, music

and other attributes associated with a character identified . . . by a user are likely to

provide an indication of the general tastes, preferences and opinions of that user."

(12:27-31) For example, "the system collects data indicative of the demographics of the

users and the styles of shirts favored by the users which fall within a specific

demographic." (12:45-48)

Claim 1 recites:

A method of collecting data from an information network in response to
user choices of a plurality of users made while accessing said information
network and navigating character-enabled (CE) network sites on said
information network, said method comprising:

storing a plurality of character data in a database accessible by
said CE network site;

storing a plurality of character[] attribute data in said database;

linking the character attribute data with one or more of the
character data;

presenting to a user interface, one or more character data defining
one or more characters for selection by the user;

upon selection of a character by the user, presenting in real time to
the user interface, the selected character along with at least one of the
character-attribute data linked to the selected character for selection by
the user;

upon selection of a character attribute by the user, presenting in
real time to the user interface, the selected character including the
selected character attribute; and

tallying the number of times the selected character attribute has
been selected by a plurality of users.

(13:23-44)

### E. Analysis

Plaintiff accuses defendant of infringing certain in-game "shops" used in three of

defendant's computer games (Team Fortress 2, Dota 2, and Portal 2) "allowing users to

select virtual items and in-game features ('character attribute data') that advance the

play of the game." The character attribute data is tallied into certain list of items

22

presented to users in the shop, such as "Top Sellers" or "Most Popular." (D.I. 1 at ¶¶ 13-20)

Applying the analytical framework of *Alice*, the court first "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts," namely, laws of nature, natural phenomena, and abstract ideas. 134 S.Ct. at 2354-55. Defendant attempts to summarize the claims of the patent as "the abstract concept of allowing a customer or potential customer to customize a 'character' by selecting 'character attributes' and then to keep a 'tally' of character/attributes that have been selected." (D.I. 12 at 11) Defendant then analogizes this concept to a "human" counterpart, namely participating in a mall focus group, wherein a person presents choices of brands or products to potential customers and tallies the choices. (D.I. 12 at 6, 12) Such a characterization does not embody the Internet centric concept of the claims. *DDR*, 773 F.3d at 1259. In other words, the claims at bar are directed to users selecting and modifying customizable characters (avatars) in real time on CE sites, as well as storing and retrieving such characters within an information network. The human analogy is not representative of the claims as a whole, which describe more than the pre-Internet business concept of "tallying" choices applied in a computer setting. (D.I. 15 at 10-11) Instead, the claims are more like those in *DDR*, to wit, "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR*, 773 F.3d at 1257.

Turning to step two of the *Alice* analysis, the method (and system) of the patent seek, in part, to address the problem of "network site loyalty" by providing the network user "audio data and visual image data that is indicative of the individuality of the

23

network user." (1:52-56)  The claims at bar provide a specific series of steps used to customize a character to users' choices in real time (claims 1 and 9), communicate with other users through an information network including CE sites (claim 15), navigate to a different site with the customized character (claim 18), and operate CE sites for a plurality of users (claim 21).  For example, claim 1 seeks to collect data in response to users' choices made on CE sites by having character data and character attribute data in a database; linking the character attribute data with character data; having a user select a character and character attribute data; updating the selections in real time; and tallying the selected character attributes.  The court concludes that the claims are innovative, i.e., do not represent the "routine and conventional" use of a computer. As with the claims in *DDR*, the claims at bar provide sufficient specificity to overcome preemption concerns. *Alice*, 134 S.Ct. at 2354; *Mayo*, 132 S.Ct. at 1294.

## V. CONCLUSION

For the foregoing reasons, defendant's motions to dismiss (D.I. 11) and transfer (D.I. 17) are denied.  An appropriate order shall issue.

24