# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| TREEHOUSE AVATAR LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>VALVE CORPORATION,<br><br>*Defendant*. | Civil Action No. 2:2017-cv-01860 |

**NONINFRINGEMENT EXPERT REPORT OF DR. MICHAEL ZYDA**
**REGARDING UNITED STATES PATENT NO. 8,180,858**

**SOME PAGES OF THIS REPORT CONTAIN**

**HIGHLY CONFIDENTIAL SOURCE CODE**

**AND ARE MARKED AS SUCH**

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

"operat[ed] under control of a site program to present a character, object, or scene to a user interface is a character enabled network site," it is my opinion that Valve did not perform step [b.] of claim 1 through its provisioning of Dota 2.

  **4.  Treehouse Has Not Shown that Valve Performed Step [1. c]: "linking the <u>character attribute</u> data with one or more of the character data;"**

93.  With respect to step [1.c] of claim 1 it is my opinion that Valve, through its provisioning of Dota 2, did not perform this part of claim 1 for at least the following reasons.

94.  Step [1.c] refers to "<u>the</u> character data" and "<u>the</u> character attribute data," each of which are required to be stored in the database of steps [1.a] and [1.b], that is, the database that is required to be "accessible to said CE network site." As stated above in Section VIII.A, Mr. Friedman's Infringement Report does not identify any character enabled (CE) network sites operated by Valve and therefore the Infringement Report does not and cannot identify a "database accessible by <u>said CE network site(s)</u>."

95.  For at least the above reason it is my opinion that Valve did not perform step [c.] of claim 1 through its provisioning of Dota 2. Moreover, in my opinion, because Mr. Friedman did not identify any character enabled sites, it is not possible for Treehouse to conclude infringement of step [c.] of claim 1 based on Mr. Friedman's opinions. In addition, because, as I described above in Section VIII.A, no Valve server or network location "operat[ed] under control of a site program to present a character, object, or scene to a user interface is a character enabled network site," it is my opinion that Valve did not perform step [c.] of claim 1 through its provisioning of Dota 2.

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

> **5.    Treehouse Has Not Shown That Valve Performed Step [1.d]: "presenting to a user interface, one or more character data defining one or more characters for selection by the user;"**

96.    With respect to step [1.d] of claim 1 it is my opinion that Valve, through its provisioning of Dota 2, did not perform this part of claim 1 for at least the following reasons.

97.    I understand that the Court has concluded that the "plain and ordinary meaning controls" with respect to interpretation of the phrase "presenting ... to a/ [the] user interface," which is recited in Claim 1 and in Claim 4 of the '858 Patent. *See* D.I. 155, p. 6.  I describe what plain and ordinary meaning means in Section VI.C, above.

98.    The word "presenting" is common, uncomplicated, and readily understandable. To a POSITA at the time of the purported invention, the plain and ordinary meaning of "presenting" in claim 1 would have simply referred to showing or manifesting.

99.    The use of presenting in the '858 Patent is consistent with this plain and ordinary meaning.  For example, the Title of the '858 Patent refers to a "method and system for presenting data over a network based on network user choices…," plainly referring to showing or manifesting data based on choices made by users of a network.  In the first lines of the specification, the patent essentially repeats this concept from the title, stating that "[t]he invention relates generally to an apparatus and method for presenting data over an information network based on choices made by the users of the network and collecting data related to the choices made by the users." (*See* EX 003, at col. 1, lines 19-22).  In the next sentence, the patent explains that "[m]ore particularly, the invention relates to an apparatus and method for presenting audio presentations and visual image presentations to a network user based on choices made by the user while in a network site and collecting data related to the choices in real-time."

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

(*See* EX 003, at col. 1, lines 22-27).  Here too, "presenting" is used in its plain and ordinary

sense to refer to showing or manifesting the "presentations" to a human user.

100.    There are seven other occurrences of "presenting" in the '858 Patent, and dozens

of occurrences of "present," "presented," "presentation," and "presentations," all of which I have

considered and found to be consistent with the plain and ordinary meaning of the term above.  In

four places (*i.e.,* Abstract; col. 2, lines 66-67; col. 3, lines 43-44; and col. 5, lines 35-36), the

'858 Patent uses the phrase "attributes presented to the user through a user interface," showing

that, in the context of the '858 Patent, presentation of concepts such as "attributes" to a user is

effected by a "user interface."

101.    Turning to the term "user interface," at the time of the purported invention of the

'858 Patent and also today, that phrase was a term of art with a particular meaning in the general

field of the '858 Patent (i.e. computers and networked systems).  Specifically, as the words "user

interface" themselves imply, the term refers to the portions and features of the user device (such

as a personal computer) that a person (the "user") may interact (i.e., "interface").

102.    Thus, with respect to a computer, which is the main, if not the only, user device

identified by Mr. Friedman in connection with his claim 1 infringement opinions, a POSITA, at

the time of the purported invention of the '858 Patent and still today, would have understood the

term "user interface" to refer to the portions of the computer with which the user could interact,

either to receive information from the computer or to provide information (such as commands) to

the computer.

103.    The term "user interface" is used in the '858 Patent in ways that are consistent

with this explanation.  First, the "user interface" is depicted in Figure 1 with its own so-named

functional box and the number "18," and it is a portion of the "user side 10" (also called "client

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

side 10") of the system, but distinct from the "network browser 20" that is also part of the client/user side 10. The corresponding text, at column 6, lines 38-55, provides additional details regarding the user interface of the '858 Patent:

> The client side 10 includes a user interface 18 and network browser 20 through which a user may communicate with the network-site side 12 via the network 14. The user interface 18 may include a personal computer, network work station or any other similar device having a central processing unit (CPU) and monitor with at least one of audio presentation, i.e. sound, capability and visual image presentation, e.g. video, animation, etc., capability. Other devices may include portable communication devices that access the information network, such as cellular telephones or hand held devices, e.g., Palm Pilots. The client side 10 further includes a graphical user interface (GUI) that facilitates communication between the client side and the network-site side 12. Client-side software may be resident in the user interface 18. Alternatively, the client-side software may be network-based software capable of being accessed over the network 14. For example, a user may be able to access the client-side software directly on the World-Wide-Web ("the Web").

104. Thus, in view of the above discussion of "presenting" and "user interface," the plain and ordinary meaning of the phrase "presenting to a user interface…" in the context of Claim 1 (and Claim 4, which depends from Claim 1) of the '858 Patent would have referred to showing or otherwise manifesting in a user-perceptible way (whether by means of visible light, audible sound, or another output that a client device could produce and that a human user could detect).

105. Applying the plain and ordinary meaning of "presenting to a user interface" to the actions that are described in the Infringement Report as allegedly constituting infringement (which generally consist of images displayed on a screen of a user's client computer), it is clear that Valve did not perform those actions, as I explain in detail herein.

106. Paragraph 87 of Mr. Friedman's Infringement Report states "As shown in Figures 1.a.1, 1.a.2, and 1.a.3, Dota 2 displays the images of a plurality of Heroes in the hero selection screen, as well as animated portraits and Hero names upon mouse-over, and then displays

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

step.  The contentions also state in conclusory fashion that "Dota 2 causes the user to choose a hero from among a plurality of possible heroes," but again, this allegation that Dota 2 causes a user to do this is unsupported, and also does not identify how Valve performs any causing.

233.    Treehouse's infringement contentions also state "[a]n additional image from the game client is shown below, including the command to the user to 'Choose your hero.'" However, providing a user this discretionary option is not a "command."  But that allegation concerns the game client, which is run by a user on a user's computer at the user's choice. Moreover, in addressing a later portion of claim 21, step [21.d.], the contentions state that "a user may log in and create a character profile."

234.    Similarly, in connection with claim 1 step [1.a], the Treehouse's infringement contentions state, when describing the exact same screen as shown for step [21.a.], that "Dota 2 offers users the ability to choose a hero;" and, in connection with claim 1, step [1.d], with respect to a similar screen, the contentions state "In the game client, a hero may be selected."  Thus, even within other portions of the infringement contentions there is a concession that these acts are performed by the user at the user's discretion.  Thus, the Treehouse infringement contentions support my opinion that Valve, through its provisioning of Dota 2, did not perform step [a.] of claim 21.

235.    In addition, Mr. Friedman's Infringement Report does not specify how a user is "creat[ing] a character."  Mr. Friedman states in Paragraph 142 that "players can create customized characters by modifying the default attributes of a Hero," but nowhere does Mr. Friedman opine that users can create new heroes.  Also in Paragraph 142, Mr. Friedman states "[t]he three figures below represent (1) the default set of equipment for the Dragon Knight character, (2) the Dragon Knight customized with the six cosmetic items from the Enchanted

*CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY*

Plate of the Crimson Wyvern set, and (3) the Dragon Knight customized with a loadout that I

created." But in each of these (1), (2), and (3), the same hero is involved: Dragon Knight. Mr.

Friedman does not appear to dispute this. Indeed, there can be no dispute that users of Dota 2

cannot create new heroes. Such functionality does not exist in Dota 2. Users can select a hero

from among the choices of pre-existing heroes in Dota 2, but users cannot create new heroes.

236.    The '858 Patent distinguishes between merely customizing a pre-profiled

character (what Mr. Friedman opines with respect to step [21.a.]) and creating a character (what

is claimed in step [21.a.]). For example Figure 3 of the '858 Patent (below) shows that choosing

a "Pre-profiled Character" (S21) and "Create own Character" (S23) are different:



116

*CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY*

The '858 Patent explains "FIG. 3 is a detailed flowchart depicting the process by which a user interacts with the character-enabled network sites of FIG. 1." Ex. 003 at Col. 5:59-61. The '858 Patent further explains:

> With reference to FIG. 3, at steps S20-S23, the user makes a character selection. For example, at step S21, <u>the user is presented with an [*sic*] visual image display of a plurality of pre-profiled characters</u>, each with a set of attributes (FIG. 4). A roll-over of each character highlights the character and may offer a sound bite indicative of the character's personality (FIG. 5).

Ex. 003 at col. 9:38-44 (emphasis added). In contrast, with respect to the "Create own Character" portion of Figure 3 the '858 Patent explains "at step S23, the character may be <u>one which is created by the user</u> using any one of several well-known animation programs, such as Flash Animation or Cold Fusion. Data pertaining to the character selections made by a user are stored in the central database 24 at steps S21a, S22a and S23a." Ex. 003 at col. 9:54-59 (emphasis added).

237.    Figure 4 of the '858 Patent, which shows several "pre-profiled characters," is below. The accompanying description is: "FIG. 4 depicts a page of an exemplary character-enabled network site having a collection of pre-profiled characters." Ex. 003 at Col. 5:62-63.

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY



FIG. 4

The '858 Patent explains that after a user selects one of the pre-profiled characters, the user can modify that pre-profiled character. In Figures 7, 8, and 9 of the '858 Patent (below) a user is able to modify the pre-profiled character "tek" by changing tek's clothing.



"FIG. 7 depicts a follow-up screen to the screen of FIG. 6, in which the remaining characters are dismissed and the opportunity to modify the selected pre-profiled

118

*CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY*

character is presented; FIG. 8 depicts a follow-up screen to the screen of FIG. 7 in
which a roll-over of the shirt causes the shirt to highlight thereby indicating that
the shirt may be modified; FIG. 9 depicts a follow-up screen to the screen of FIG.
8 in which several choices with regard to the brand of shirt are presented."

Ex. 003 at col. 6:5-14.

238.    The '858 Patent distinguishes the above modification of a pre-profiled character
from creating a character.  For example, the '858 Patent explains: "the character may have a pre-
determined persona which the user may choose to adopt.  Alternatively the user may modify or
customize the persona of a pre-profiled character.  Additionally, the user may create his own
character persona from scratch."  Ex. 003 at col. 7:36-40.

239.    The '858 Patent further distinguishes between customizing a pre-profiled
character and creating a character in the following passages:

> With regard to customized characters, the site program/data provides the audio
> data or visual image data necessary to modify or change select attributes of a pre-
> profiled character.  For example, as shown in FIG. 9, the site program/data may
> present to the user a pre-profiled character of a human figure wearing a 'brand A'
> shirt, while further presenting visual images representative of selectable attributes,
> e.g., brand B, brand C or brand D shirts.  As a subset of the attribute selections,
> the site program/data may provide for further modification of an attribute.  For
> example, once the visual image data for a specific brand is presented and selected,
> the site program/data may present to the user the option of changing the style, size
> or color of the shirt.

Ex. 003 at col. 8:12-24.

> With regard to created characters, the site program/data may allow the user to
> create a character from scratch.  This may be done using commercially available
> animation programs such as Flash Animation (.swf) and Cold Fusion.  Similar to
> the customized character, the site program monitors the development of a created
> character, notes the attributes of the created character and selects the audio

119

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

presentations and visual image presentations provided at the user interface 18 accordingly.

Ex. 003 at col. 8:40-48.

240.    These passages again show that the '858 Patent differentiates between selecting a pre-profiled character and customizing it, and creating a character.

241.    The above discussion from the '858 Patent shows that what Mr. Friedman's Infringement Report references with respect to Dota 2 and this claim step is modifying or customizing a pre-profiled hero and not creating a hero.  The fact that users cannot create a hero in Dota 2 is a separate reason that Valve, through its provisioning of Dota 2, did not perform step [a.] of claim 21.

242.    As stated above in Section VIII.A, Mr. Friedman's Infringement Report (inclusive of the Treehouse infringement contentions that are purportedly incorporated by reference) does not identify any character enabled (CE) network sites operated by Valve as recited by this claim step.  It is my opinion that Mr. Friedman has not shown that any Valve operated "network location" operated under control of a site program to present a character, object, or scene to a user interface, and as I have explained earlier in this report, none does.

243.    For at least each of the above independent reasons it is my opinion that Valve did not perform step [a.] of claim 21 through its provisioning of Dota 2.  Moreover, in my opinion, because Mr. Friedman did not identify any character enabled sites, it is not possible for Treehouse to conclude infringement of step [a.] of claim 21 based on Mr. Friedman's opinions. In addition, because, as I described above in Section VIII.A, no Valve server or network location "operat[ed] under control of a site program to present a character, object, or scene to a user interface is a character enabled network site," it is my opinion that Valve did not perform step [a.] of claim 21 through its provisioning of Dota 2.

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

deposition or trial, or in an effort to challenge these opinions, I may also testify on additional topics within my area of expertise to further explain my opinions or rebut any evidence or testimony offered as contrary to my opinions.

Executed on: January 25, 2021, at Carmel By the Sea, California, USA

Dr. Michael Zyda

164